# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

WILLIAM B. ACHEFF,

       Plaintiff and Counter-Defendant,

  vs.

PETER B. LAZARE, as Trustee of the EDELMAN
TRUST a/k/a the JON J. EDELMAN TRUST U/T/A
dated March 19, 1996, as Amended; and UNITED
STATES OF AMERICA BY AND THROUGH THE
INTERNAL REVENUE SERVICE (IRS),

       Defendants,

UNITED STATES OF AMERICA,

       Defendant, Counter-Plaintiff, Cross-
       Plaintiff, and Third-Party Plaintiff,

  vs.

PETER B. LAZARE, as Trustee of the EDELMAN
TRUST a/k/a the JON J. EDELMAN TRUST U/T/A
dated March 19, 1996, as Amended,

       Cross-Defendant, and

JON EDELMAN a/k/a JON J. EDELMAN or JOHN J.
EDELMAN,

       Third-Party Defendant.

Case No. 12-CV-100

# MEMORANDUM OPINION AND ORDER

This case was tried to the Court for three days beginning December 2, 2013. Following the presentation of testimony and evidence by the parties and the arguments of counsel, the Court took the matter under advisement.  Having considered the evidence and testimony received at trial, the arguments of counsel, and the record herein, the Court now FINDS, CONCLUDES, and ORDERS as follows:

## SUMMARY OF THE CASE

Third-party Defendant Jon J. Edelman has not seen eye-to-eye with the IRS since the 1970s.  In 2010 and 2011, this Court entered two final judgments in favor of the USA and against Mr. Edelman in an aggregate amount exceeding $334.8 million for delinquent federal income tax obligations.  (Stipulation ¶¶ 24, 26, ECF. No. 152 at p. 6, Ex. 6, 8.) While the IRS seems to have gotten the better of him at this point in time, Mr. Edelman continues to frustrate the IRS and (more than) get by with a little help from his friends.[1]

This civil action was commenced in New Mexico state court by Plaintiff/Counter Defendant William Acheff ("Acheff") to collect on a defaulted promissory note and to foreclose a mortgage he held on real property in New Mexico.  (ECF No. 1-2, 1-3, 1-4.) The real property is known as the "Taos property" and is located in Taos County, New Mexico.[2]  (Stipulation ¶ 75.)  The Taos property is titled in the name of the Defendant,

---

[1] The Beatles, *With a Little Help from My Friends*, *on* Sgt. Pepper's Lonely Hearts Club Band (Capital Records 1967).
[2] The Taos property has a street address of 35 Vista Del Mesa, Arroyo Hondo, NM 87513.  It consists of three tracts of land, the legal description of which can be found at Exhibit 1 and ECF No. 9-1.

the Edelman Trust a/k/a the Jon J. Edelman Trust ("the Edelman Trust").  (Ex. 129, 15.)

The trustee of the Edelman Trust is Defendant/Crossclaim Defendant Peter Lazare

("Lazare").  (Stipulation ¶¶ 65, 67.)  Acheff also included the United States of America,

Internal Revenue Service, as a defendant because it holds several tax judgments and tax

liens against Mr. Jon Edelman (the namesake of the Edelman Trust), and Acheff believed

the USA might claim an interest in the Taos property.  (Compl. ¶ 24, ECF No. 1-2 at pp.

6-8.)  Acheff assumed correctly.  The USA removed the case to federal court (ECF No.

1) and filed a counterclaim against Acheff, a crossclaim against the trustee of the

Edelman Trust, and a third-party complaint against Mr. Edelman (ECF No. 9).

   The USA's portion of this lawsuit constitutes the real contest at issue.  The USA

wants to enforce its tax judgments and liens against the Taos property, the Edelman

Trust, and a yacht aptly named the "*Elusive*."  This Court previously ruled that Acheff's

mortgage on the Taos property is senior to the USA's liens against the property because

the mortgage was recorded several years prior to the tax liens.  (ECF No. 77, 97, 108

n.2.)  The real issue remaining is to what extent, if any, the USA can collect against the

assets in question to collect on its significant tax judgments against Mr. Edelman.

## FACTS

   Based on the exhibits and testimony produced at trial along with the documents in

the record, the Court finds the following facts by a preponderance of the evidence:

In the 1980s, Mr. Edelman was on top of the world.  He made a lot of money in the tax shelter business and lived an extravagant lifestyle.  In fact, he purchased the 55-foot yacht at issue in this case, "*Elusive*," in 1984, and it immediately won the Astor Cup yacht race in New York.  (Stipulation ¶ 100; Ex. 213.)  The yacht was initially titled to the Serendipity Marine Limited, an Oregon corporation, of which Mr. Edelman was the president.  (Stipulation ¶ 100.)

In 1988, Acheff owned the Taos property[3] and had listed it for sale.  (Stipulation ¶ 68.)  Mr. Edelman and his wife, Barbara, traveled to New Mexico to look at the Taos property.  (*Id.*)  In 1989, they purchased the property, placing title to it in Barbara Edelman's name.  (Stipulation ¶ 69; Ex. 30, 130.)  Mr. Edelman and his wife later resided on the Taos property.  (Stipulation ¶ 70.)  In 1991, Barbara Edelman gave a mortgage on the Taos property to Chase Manhattan Financial Services, Inc.  (Stipulation ¶ 71.)

Mr. Edelman's reign of success began to falter in 1989 when he was indicted on several federal tax fraud charges in the United States District Court for the Southern District of New York.  (Stipulation ¶ 44.)  In 1991, Mr. Edelman and his business partner, Bernhard Manko, were convicted of federal income tax fraud and conspiracy to defraud the United States.  *United States v. Manko*, 979 F.2d 900, 901-02 (2nd Cir. 1992).  They had specialized in tax shelters and tax deferral techniques.  *Id.* at 902.  Mr. Edelman was

---

[3] The Taos property consists of nearly 30 acres with an 8,500 square-foot residence, a 2,200 square foot guesthouse, an indoor swimming pool, and a five-car garage.  (Stipulation ¶ 76.)

sentenced to five years imprisonment for his offenses.  *Id.*  In October 1992, the Second Circuit Court of Appeals affirmed Mr. Edelman's convictions and sentence.  *Id.* at 912.

Mr. Edelman testified at trial that in the early 1990s, while his criminal case was pending, Barbara Edelman founded the Cayman Islands company known as "Astrolabe Marine Enterprises Ltd."  He stated this company was founded solely to own and care for the yacht, the *Elusive*.  The corporation issued one share, which was held by Barbara Edelman.  Thus, in the early 1990s, the *Elusive* was owned by a Cayman Islands company, which was in turn owned by Barbara Edelman.  This is significant because it removed any direct connection between the *Elusive* and Mr. Edelman.  Additionally, while released on bond prior to his criminal trial, Mr. Edelman obtained a United States passport, which would prove to come in handy within a few years.  (Ex. 24 at p. 4.)

In March 1993, Mr. Edelman self-settled the "Delos Trust" under the laws of the Principality of Liechtenstein, designating himself, his wife, and his three minor children as trust beneficiaries.  (Stipulation ¶ 57.)  Mr. Edelman testified at trial that he liquidated a prior New York trust (of which he was not a beneficiary) to fund the Delos Trust, and he put approximately $5.0 million into the Delos Trust.  A Liechtenstein company, the "Protec Trust Management Establishment, Vaduz," was named as the trustee.  (*Id.* at ¶ 58; Ex. 61.)  Mr. Edelman testified at trial that he chose this company as the trustee

because he was already familiar with it and trusted its personnel.  It is clear to the Court that Mr. Edelman was laying the groundwork for his subsequent Houdini act.

In July 1993, Mr. Edelman began serving his prison sentence at the Federal Prison Camp in Florence, Colorado.  (Stipulation ¶ 51.)  Two months later, he escaped from prison.  (*Id.* at ¶ 52.)  For more than two years, Mr. Edelman, his wife, and their three young children resided on the *Elusive* sailing the South Pacific Ocean, moving among several nations including Tonga, Fiji, Vanuatu, and New Zealand.  (*Id.* at ¶¶ 53-56; Ex. 24, 24A.)  He was ultimately detained by authorities in the Republic of Vanuatu who turned him over to United States Marshals in November 1995.  (Stipulation ¶ 54; Ex. 24.)  Mr. Edelman testified at trial that he supported himself and his family while a fugitive using money from the Delos Trust[4] (in Liechtenstein) and sailed the *Elusive* under the Cayman Islands flag (rather than a United States flag).  Upon his arrest and return to the United States, Mr. Edelman pled guilty to escape from a federal penal institution and was sentenced to an additional 18 months imprisonment.[5]  (Ex. 24A, 24B.)

---

[4] Mr. Edelman claimed at trial that he did not know he had named himself as a beneficiary when he settled the Delos Trust.  Ignoring the rather dubious nature of this claim, Mr. Edelman is charged as a matter of law with knowing the contents of documents he signs.  *Consol. Edison Co. of N.Y., Inc. v. United States*, 221 F.3d 364, 371 (2d Cir. 2000) (stating that "individuals are charged with knowledge of the contents of documents they sign—that is, they have 'constructive knowledge' of those contents").

[5] In September 1995, just prior to his capture, Mr. Edelman wrote to the Prime Minister of Vanuatu to request asylum.  There, he stated that he walked away from the prison camp "in hope to protect my wife and children."  (Ex. 24 at p. 4.)  The irony of escaping federal prison to hide out on a yacht in the Pacific Ocean while claiming to do so as a good husband and father is not lost on this Court.

While Mr. Edelman and his family were hiding in the South Pacific, Barbara Edelman's mortgage on the Taos property went into default.  The mortgage company foreclosed its lien on the property, and Acheff re-purchased the property while it was in foreclosure.  (Stipulation ¶ 77; Acheff Depo. (Ex. 30) at 10.)

In 1996, while Mr. Edelman was still in prison (this time in a secured facility in Texas), his mother, Mildred Ash, settled the "Edelman Trust."  (Stipulation ¶ 62.)  She designated Mr. Edelman and his three minor children as the beneficiaries of the Edelman Trust, a spendthrift trust settled under the laws of New York.  (*Id.*)  Dennis Stein, a tax attorney and long-time friend of Mr. Edelman prepared the Edelman Trust documents.  (Stipulation ¶ 63.)  Stein was named the trustee of the Edelman Trust.  (Stipulation ¶ 62.)  Mr. Edelman testified at trial that his mother created the Edelman Trust to assist in paying his mounting legal fees.  Mr. Edelman failed to explain what benefit his three children were intended, despite them also being named beneficiaries.

In 1997, while still in prison, Mr. Edelman contacted Acheff about re-purchasing the Taos property.  (Stipulation ¶ 78.)  Through multiple discussions, Acheff agreed to sell the Taos property back to Mr. Edelman for $2.0 million.  (Acheff Depo. (Ex. 30) at 11-12.)  The sale terms they agreed to included:  $100,000 in earnest money, a down payment of $900,000 at closing, semi-annual interest-only payments for five years, and a balloon payment for the remaining $1.0 million after five years.  (Tr. of Prelim. Injunct.

Hr'g. at p. 38 (Acheff Testimony).)  Mr. Edelman told Acheff that the actual purchaser of the Taos property would be Mr. Edelman's trust.  (*Id.* at 41.)  They then turned their agreement over to their respective attorneys[6] to finalize the deal.  (*Id.* at 40.)  The attorneys, though, could not agree on the interest rate on the promissory note for the remaining $1.0 million.  (*Id.* at 39.)  After this disagreement dragged on for several months, Acheff traveled to visit Mr. Edelman in prison in Texas.  (*Id.* at 40.)  Acheff asked Mr. Edelman for 8.0% interest on the remaining $1.0 million, and Mr. Edelman agreed.  (*Id.*)

Mr. Edelman originally intended the Delos Trust in Liechtenstein to purchase the Taos property.  (*See* Ex. 52; Stein Depo. at 56.)  Mr. Edelman testified at trial that, for reasons not entirely explained, the parties concluded the Delos Trust could not hold legal title to New Mexico real property.  Consequently, the Edelman Trust was substituted as the buyer, and the Delos Trust "loaned" the $900,000 down payment to the Edelman Trust.  (Ex. 11.)  The Edelman Trust supplied the $100,000 earnest money.  (Ex. 35.)  The sale and purchase of the Taos property closed in the summer of 1998.  (Ex. 128, 129.)  The $900,000 "loan" from the Delos Trust to the Edelman Trust was to be secured by a second mortgage on the Taos property (*see* Ex. 11), but no mortgage was ever granted by the Edelman Trust (or demanded by the Delos Trust).  Additionally, Mr.

---

[6] Mr. Michael Messina from New Mexico represented the Delos Trust as buyer; Mr. Scott Sanger from New Mexico represented Acheff as seller.

Edelman testified at trial that the Edelman Trust has never made a single payment to the Delos Trust to repay the $900,000 "loan."

Mr. Edelman was released from prison in 1999 and resided on the Taos property for much of the next twelve years. (Stipulation ¶ 86.) Also in 1999, Mr. Edelman and Barbara Edelman divorced. (Jon Edelman Depo. (Ex. 21) at p. 11.) Mr. Edelman testified at trial that Barbara Edelman's sole share of Astrolabe Marine (which owns the *Elusive*) was transferred to the Delos Trust in 1999 as part of their divorce.

At 8.0% interest on a $1.0 million loan, Acheff was due $80,000 per year, or semi-annual payments of $40,000 each. From 2001 to 2005, the Delos Trust wire-transferred at least eight payments to the Edelman Trust, each for $40,000 (minus the wire fee); the Edelman Trust (through trustee Dennis Stein's law firm) would then pay $40,000 to Acheff by check. (Ex. 184 at ET-000566[7], Ex. 184 at ET-000567, Ex. 184 at ET-000569, Ex. 187 at ET-000788, Ex. 187 at ET-000790, Ex. 193 at ET-000958, Ex. 193 at ET-000959, Ex. 39 at ET-003599.) This arrangement was verified by Peter Lazare's trial testimony. Accordingly, the Delos Trust, not the Edelman Trust (the actual purchaser of the Taos property), paid many of the interest-only payments on the Taos property. Thus, the self-settled Delos Trust paid the $900,000 down payment as a "loan" and also had the honor of paying several of the semi-annual interest-only payments for the Taos property, which it did not own or derive any benefit from.

---

[7] ET-##### refers to the USA's Bates stamps.

In 2004, Mr. Edelman decided he wanted a different trustee handling the Edelman Trust.  He testified at trial that he approached his mother (the Edelman Trust settlor) and requested his friend, Peter Lazare, take over as trustee.  Mr. Edelman testified Dennis Stein drafted the documents adding Peter Lazare and his wife as co-trustees of the Edelman Trust, and Mr. Edelman even delivered them to his mother for her signature.  In 2006, Dennis Stein completed the necessary paperwork to add Peter and Carla Lazare as signatories on the Edelman Trust bank account.  (Ex. 154.)  In late 2007, Dennis Stein completely resigned as trustee of the Edelman Trust.[8]  (Stein Depo. at p. 19.)  Carla Lazare resigned in early 2008, leaving Peter Lazare as the sole trustee.  (*Id.*)  He has been the only trustee of the Edelman Trust since.  Peter Lazare testified at trial that he has been friends with Mr. Edelman for over 30 years.  (*See* Stipulation ¶ 37.)

When the due date for the final $1.0 million balloon payment for the Taos property approached, the Edelman Trust did not have the money (hence the interest payments by the Delos Trust).  Acheff and the Edelman Trust agreed to a loan modification which continued the interest-only payments and delayed the balloon payment.  (ECF No. 1-2 at ¶ 10.)  Acheff and the Edelman Trust (first through Dennis Stein and later through Peter Lazare) repeated this dance 13 more times for a total of 14 loan modifications.  (ECF No. 1-4 at pp. 7-10.)  Finally, Acheff's patience ran out in

---

[8] There was some disagreement about whether Mr. Edelman or Peter Lazare asked Dennis Stein to resign, but that confusion is immaterial to the pending issues.

2012 when he filed the instant lawsuit to collect on the defaulted promissory note and to foreclose the mortgage.  (ECF No. 1-2, 1-3, 1-4.)  The USA then stepped into the action and essentially transformed the matter to a debt collection case.

Further facts will be set forth as necessary in the Court's discussion of the issues.

## DISCUSSION

Based upon the evidence and arguments at trial, the Court finds there are three primary subjects to address:  (1) whether the Delos Trust is Mr. Edelman's alter ego, (2) an appropriate remedy if the Delos Trust is Mr. Edelman's alter ego, and (3) whether to convert the preliminary injunction against the Edelman Trust into a permanent injunction.

I.   **The Delos Trust in Liechtenstein is Mr. Edelman's Alter Ego and its Assets are Subject to Collection by the USA**

The primary issue in this case involves Mr. Edelman's personal use of funds from the Delos Trust over a period of several years.  During this period, the USA possessed several tax judgments against Mr. Edelman along with several liens against Mr. Edelman's property.  Accordingly, Mr. Edelman had the money from the Delos Trust routed through various sources in an attempt to avoid the possibility the USA would seize the funds to apply toward his daunting tax debt.  The USA now seeks to collect on the identifiable, discrete transactions originating in the Delos Trust that directly benefitted Mr. Edelman.  Essentially, the USA asserts Mr. Edelman laundered his money from the Delos Trust in an attempt to keep it from the government, and the Court agrees.

### A.    Applicable Federal Tax Lien Law

Under 26 U.S.C. § 6321, the USA may satisfy a tax deficiency by attaching a lien on any "property" or "rights to property" belonging to the taxpayer.  Thus, the overarching legal question in this case is whether each asset in question constitutes property belonging to Mr. Edelman or whether he has rights to the property.

Under § 6321, the assessments against the tax debtor constitute a lien in favor of the USA "upon all property belonging to" the tax debtor.  *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51, 97 S. Ct. 619, 627, 50 L. Ed. 2d 530 (1977).

> To determine whether a particular asset falls within the reach of a § 6321 lien, we and any court must engage in a two-part inquiry.  First, we must ask what rights under state law, if any, the taxpayer has in the asset the IRS seeks to attach.  This step is necessary at the outset because it is, after all, "state law [that] creates legal interests and rights" in things.  *Drye v. United States*, 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999) (internal quotation omitted).   Second, now with a sense of what state legal entitlement the taxpayer enjoys in the asset at issue—with a sense of the bundle of rights state law gives him to the thing or *res* at issue—we must ask, under federal law, whether those "state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation."  *Id.*   As the Supreme Court has explained the relationship between these two steps, it is "[s]tate law [that] creates legal interests and rights [and it is] [t]he federal revenue acts [that] designate what interests or rights, so created, shall be taxed."  *Id.* (quoting *Morgan v. Commissioner*, 309 U.S. 78, 80, 60 S.Ct. 424, 84 L.Ed. 585 (1940)).

*In re Krause*, 637 F.3d 1160, 1163 (10th Cir. 2011).  Property held by the alter ego of a tax payer is regarded as the taxpayer's property, and is subject to the government's judgments and collection attempts.  *G.M. Leasing Corp.,* 429 U.S. at 351, 97 S.Ct. at

627-28 ("If [the entity] was Norman's alter ego, it had no countervailing effect for purposes of his federal income tax.  It would then follow that the Service could properly regard [the entity's] assets as Norman's property subject to the lien under § 6321.").

### B.     Step 1:  State Law Property Right

"When an entity is so dominated by a taxpayer that it does not have a separate and independent existence, it is considered [to] be an alter ego of the taxpayer." *United States v. Novotny*, 90 A.F.T.R.2d 2002-5684, 2002-5698 (D. Colo. 2002) (citing *G.M. Leasing Corp. v. United States*, 514 F.2d 935 (10th Cir. 1975), *rev'd on other grounds*, 429 U.S. 338 (1977)).  The USA may use the property held by the alter ego of a taxpayer to satisfy the federal tax obligation.  *Id.*; *United States v. Gosnell*, 961 F.2d 1518, 1519 (10th Cir. 1992) ("Property held in the name of an entity which is the alter ego of a taxpayer may be levied on to satisfy the tax liabilities of the taxpayer.").  Additionally, trusts may be treated like corporate entities and held to be a taxpayer's alter ego.  *See In re Krause*, 637 F.3d 1160, 1165-66 (10th Cir. 2011).  Generally, federal courts look to state law to determine whether an entity is a nominee or alter ego of a taxpayer.  *Aquilino v. United States*, 363 U.S. 509, 512-513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

### 1.     New Mexico's Alter Ego Law

Under New Mexico law, the alter ego theory seeks to pierce the veil to disregard the separate nature of the trust and the taxpayer, thus using the trust's assets to satisfy the

taxpayer's debt.  *See Alto Eldorado P'ship v. Amrep*, 138 N.M. 607, 614, 124 P.3d 858, 592 (N.M. 2005).

> Three requirements must be satisfied to obtain this relief: a showing of instrumentality or domination, improper purpose and proximate causation. *Harlow v. Fibron Corp.*, 100 N.M. 379, 382, 671 P.2d 40, 43 (Ct.App.), cert. denied, 100 N.M. 439, 671 P.2d 1150 (1983).  "Instrumentality" or "domination" means proof that the subsidiary or other subservient corporation was operated not in a legitimate fashion to serve the valid goals and purposes of that corporation but it functioned instead under the domination and control and for the purposes of some dominant party.  New Mexico decisions refer to the "instrumentality" or "domination" requirement as the alter ego doctrine theory. *Id.*  Thus, where a subsidiary is a mere business conduit for the parent or where there is such unity of interest and ownership that the individuality or separateness of the two corporations has ceased, the parent may be held liable for contractual obligations of its subsidiary under this theory.  But it also requires a showing that recognition of the separate corporate existence of the two corporations would sanction fraud or other improper purposes.  *Harlow*, 100 N.M. at 382, 671 P.2d at 43; *see also* Annotation, *Corporate Liability–Subsidiary*, 38 A.L.R.3d 1102, 1119 (1971).

*Scott v. AZL Res., Inc.*, 107 N.M. 118, 121, 753 P.2d 897, 900 (N.M. 1988).

    2.    <u>Alter Ego Analysis</u>

The Court first applies New Mexico law on alter ego to determine whether Mr. Edelman holds a state-delineated property right in the Delos Trust.[9]  Considering the first requirement for alter ego, instrumentality or domination, the Court finds Mr. Edelman exerted near-complete control over the Delos Trust and where its funds went.  The Delos

---

[9] The Court notes that at least one circuit, the Second Circuit, has held that where an alter ego trust exists, the court "need not defer to a state determination of property rights before attributing assets of that trust to a debtor taxpayer." *United States v. Trupin*, 119 Fed.Appx. 323, 325 (2d Cir. 2005) (unpublished).  It appears, though, that the Tenth Circuit has never explicitly held such.  Thus, the Court will begin its analysis with a state determination of property rights.

Trust was used as an overseas safe haven for Mr. Edelman's money, and he simply withdrew it from the Delos Trust on an as-needed basis. The Delos Trust never operated as an independent entity, but was simply a conduit for Mr. Edelman to pay for his personal expenses and lifestyle.

The first example demonstrating instrumentality concerns the purchase of the Taos property. To begin with, the Delos Trust was originally slated to be the purchaser of the property (*see* Ex. 145), but there is no evidence to suggest that the Delos Trust's trustee (a Liechtenstein company) did any of the negotiating. All negotiating was done by Mr. Edelman. (Tr. of Prelim. Injunct. H'rg at 38-40 (Acheff testimony).) A trustee cannot have a more hands-off approach to its trustee duties than the Delos Trust trustee exhibited here. Once the Taos property purchaser was amended to be the Edelman Trust, the Delos Trust simply forwarded the $900,000 down payment as instructed, receiving absolutely nothing in return. Mr. Edelman and the Edelman Trust have described the $900,000 payment as an "unsecured loan," but Mr. Edelman testified at trial that the Edelman Trust has never paid a single payment to the Delos Trust on this "loan."[10] This $900,000 "loan" was simply Mr. Edelman laundering his money into the United States without personally touching it to keep it from the government's collection efforts, and the proof in that pudding is found at Exhibits 82 and 43. In an April 2006 e-mail, Mr. Edelman

---

[10] It does appear, however, that the Edelman Trust included interest from this "loan" as a tax deduction on at least one of its tax returns. (*See* Ex. 188 (email from Mr. Edelman noting that the "interest accrued on the $900,000 loan from Delos was $13,500 for the year ending 12/31/2003").)

told Dennis Stein's law firm that the Delos Trust cannot pay the tax obligation of the Edelman Trust for that year because the "Delos Trust has very little money left." (Ex. 82.) Then, in a March 2007 letter from Mr. Edelman to the Delos Trust trustee, Mr. Edelman instructed the remaining funds of the Delos Trust be transferred to Mr. Edelman's son in the United States. (Ex. 43.) These exhibits demonstrate that Mr. Edelman executed complete control over the funds in the Delos Trust while the named trustee was only a compliant figurehead. If the $900,000 payment were truly a loan, then the Delos Trust would be expecting and receiving (or trying to collect) payment from the Edelman Trust, particularly when it was low on money. Also, if the Delos Trust were acting independently in any fashion, it would not empty its remaining assets without having ever collected a dime in interest or principal on the $900,000 "loan" from the Edelman Trust in nearly nine years.

The second example demonstrating instrumentality concerns interest-only payments for the Taos property. From 2001 to 2005, the Delos Trust made several semi-annual interest-only payments to Acheff, each for $40,000. Specifically, the Delos Trust would wire-transfer each payment of $40,000 (minus the wire fee of $15 to $20) to the Edelman Trust through trustee Dennis Stein's law firm[11]; the law firm would then pay $40,000 to Acheff by check. This arrangement occurred no less than eight times:

(1)     September 2001 (Ex. 184 at ET-000566),

---

[11] Dennis Stein was still the trustee of the Edelman Trust at this time.

(2)     late-March/early-April 2002 (Ex. 184 at ET-000567),
(3)     October 2002 (Ex. 184 at ET-000569),
(4)     March 2003 (Ex. 187 at ET-000788),
(5)     September 2003 (Ex. 187 at ET-000790),
(6)     April 2004 (Ex. 193 at ET-000958),
(7)     October 2004 (Ex. 193 at ET-000959), and
(8)     April 2005 (Ex. 39 at ET-003599).

(*See also* Ex. 204 for summary.)  Thus, the Delos Trust paid the interest payments on the

Edelman Trust's mortgage while Mr. Edelman resided on the Taos property during these

years.  The Delos Trust paid these interest-only payments and received absolutely no

benefit in return—no repayment of its $900,000 "loan," no ownership interest in the Taos

property, nothing.  Mr. Edelman, though, certainly enjoyed the bounty of the Delos

Trust's generosity.

The final example demonstrating instrumentality concerns the payments to Mr.

Edelman from the Delos Trust.  Of course, Mr. Edelman was canny enough to avoid

receiving payments directly from the Delos Trust.  Instead, like the interest payments on

the Taos property, the payments were wire-transferred from the Delos Trust to Dennis

Stein's law firm (either into the Edelman Trust bank account or the "Special E

Account"[12]), and then the law firm would transfer money directly to Mr. Edelman.  In all,

---

[12] "Special E Account" refers to a checking account that Dennis Stein's law firm controlled.  Dennis Stein explained in his deposition, when not conveniently hiding behind the attorney-client privilege, when the Delos Trust would wire money to his law firm, he would then put it into the Special E Account and write checks out of that account for Mr. Edelman's favor.  (Stein Depo. at 143.)  Additionally, the Court finds that Exhibit 173 is the ledger for the Special E Account; although Exhibit 173 lacks any identifying information on its face, its entries match checks that were drawn on Special E Account.  (*Compare* Ex. 173, *with* Ex. 172A and 172B.)  Further, one of the

from 2001 through 2005, at least $381,000 was paid directly to Mr. Edelman in this fashion.  The Delos Trust transferred significant amounts to the "Special E Account" or the Edelman Trust account on more than 25 occasions.  Dennis Stein's law firm then transferred to Mr. Edelman amounts between $2,000 and $30,000 (with the most common amount being $10,000) more than 40 times during that same period.  (*Id.*)  The Court breaks down the applicable transfers and totals here[13]:

**SPECIAL E ACCOUNT:**

| Date | From Delos Trust to Dennis Stein's Law Firm | From Stein's Law Firm to Mr. Edelman |
|---|---|---|
| Dec. 2001 | $19,975 (Ex. 173 at ET-000606) | |
| Jan. 2002 | $19,975 (Ex. 173 at ET-000606) | |
| Feb. 2002 | $42,475 (Ex. 173 at ET-000607) | |
| Mar. 2002 | | $2,000 (Ex. 173 at ET-000607) |
| Mar. 2002 | $24,975 (Ex. 173 at ET-000607) | |
| Mar. 2002 | | $3,000 (Ex. 173 at ET-000607) |
| Mar. 2002 | | $2,000 (Ex. 173 at ET-000607) |
| Mar. 2002 | $19,975 (Ex. 173 at ET-000608) | |
| April 2002 | $14,975 (Ex. 173 at ET-000608) | |
| May 2002 | | $2,000 (Ex. 173 at ET-000609) |
| May 2002 | $19,975 (Ex. 173 at ET-000609) | |
| **Special E Acct Total:** | **$162,325** | **$9,000** |

**EDELMAN TRUST ACCOUNT[14]:**

| Date | From Delos Trust to Dennis Stein's Law Firm | From Stein's Law Firm to Mr. Edelman |
|---|---|---|
| June 2002 | $14,985 (Ex. 184 at ET-000567) | |

entries in Exhibit 173 is described as "transferred to 'E' Acct" and is shown to be a deposit/credit in this ledger. (Ex. 173 at ET-000608.)

[13] The Court's findings, as shown in these tables, largely track the USA's summary found at Exhibit 205, though there are a few differences.

[14] This table omits the eight wire transfers from the Delos Trust that were for the interest-only payments on the Taos property (each approximately $40,000) because they were accounted for and discussed above.

| | | |
|---|---|---|
| June 2002 | | $2,000 (Ex. 184 at ET-000567) |
| July 2002 | $24,985 (Ex. 184 at ET-000567) | |
| July 2002 | | $17,000 (Ex. 184 at ET-000567) |
| July 2002 | $24,985 (Ex. 184 at ET-000568) | |
| July 2002 | | $15,000 (Ex. 184 at ET-000568) |
| July 2002 | | $5,000 (Ex. 184 at ET-000568) |
| July 2002 | $10,206.54 (Ex. 184 at ET-000568) | |
| July 2002 | $9,985 (Ex. 184 at ET-000568) | |
| Aug. 2002 | $44,985 (Ex. 184 at ET-000568) | |
| Aug. 2002 | | $30,000 (Ex. 184 at ET-000568) |
| Sep. 2002 | | $15,000 (Ex. 184 at ET-000569) |
| Sep. 2002 | $9,985 (Ex. 184 at ET-000569) | |
| Oct. 2002 | | $10,000 (Ex. 184 at ET-000569) |
| Oct. 2002 | | $12,000 (Ex. 184 at ET-000569) |
| Oct. 2002 | $19,985 (Ex. 184 at ET-000569) | |
| Oct. 2002 | | $4,000 (Ex. 184 at ET-000569) |
| Oct. 2002 | $19,985 (Ex. 184 at ET-000569) | |
| Nov. 2002 | | $15,000 (Ex. 184 at ET-000569) |
| Nov. 2002 | $19,985 (Ex. 184 at ET-000570) | |
| Nov. 2002 | | $4,000 (Ex. 184 at ET-000570) |
| Nov. 2002 | | $10,000 (Ex. 184 at ET-000570) |
| Dec. 2002 | $19,9895 (Ex. 184 at ET-000570) | |
| Dec. 2002 | | $20,000 (Ex. 184 at ET-000570) |
| **Edelman Trust Acct 2002 Total:** | **$220,056.54** | **$159,000** |
| Jan. 2003 | $19,985 (Ex. 187 at ET-000787) | |
| Jan. 2003 | | $5,000 (Ex. 187 at ET-000787) |
| Jan. 2003 | | $10,000 (Ex. 187 at ET-000787) |
| Feb. 2003 | | $5,000 (Ex. 187 at ET-000787) |
| Feb. 2003 | | $10,000 (Ex. 187 at ET-000787) |
| Feb. 2003 | $19,985 (Ex. 187 at ET-000787) | |
| Feb. 2003 | | $10,000 (Ex. 187 at ET-000787) |
| Mar. 2003 | | $10,000 (Ex. 187 at ET-000788) |
| Mar. 2003 | | $10,000 (Ex. 187 at ET-000788) |
| Mar. 2003 | $19,985 (Ex. 187 at ET-000788) | |
| Mar. 2003 | | $10,000 (Ex. 187 at ET-000788) |
| Apr. 2003 | | $10,000 (Ex. 187 at ET-000788) |
| Apr. 2003 | $19,985 (Ex. 187 at ET-000788) | |
| Apr. 2003 | | $10,000 (Ex. 187 at ET-000788) |

| | | |
|---|---|---|
| May 2003 | | $8,000 (Ex. 187 at ET-000788) |
| May 2003 | $29,985 (Ex. 187 at ET-000789) | |
| May 2003 | | $8,000 (Ex. 187 at ET-000789) |
| May 2003 | | ($5,000) (Wire from Mr. Edelman) |
| May 2003 | $19,985 (Ex. 187 at ET-000789) | |
| May 2003 | | $10,000 (Ex. 187 at ET-000789) |
| June 2003 | | $10,000 (Ex. 187 at ET-000789) |
| July 2003 | $19,985 (Ex. 187 at ET-000790) | |
| July 2003 | | $18,000 (Ex. 187 at ET-000790) |
| Aug. 2003 | $19,985 (Ex. 187 at ET-000790) | |
| Aug. 2003 | | $4,000 (Ex. 187 at ET-000790) |
| Sep. 2003 | | $10,000 (Ex. 187 at ET-000790) |
| Oct. 2003 | | $5,000 (Ex. 187 at ET-000791) |
| Oct. 2003 | | $5,000 (Ex. 187 at ET-000791) |
| Oct. 2003 | $19,985 (Ex. 187 at ET-000791) | |
| Oct. 2003 | | $10,000 (Ex. 187 at ET-000791) |
| Dec. 2003 | | $10,000 (Ex. 187 at ET-000791) |
| **Edelman Trust Acct 2003 Total:** | **$189,865** | **$183,000** |
| Apr. 2004 | | $5,000 (Ex. 193 at ET-000958) |
| May 2004 | | $5,000 (Ex. 193 at ET-000958) |
| June 2004 | | $15,000 (Ex. 193 at ET-000958) |
| **Edelman Trust Acct 2004 Total:** | **$0** | **$25,000** |
| Apr. 2005 | | $5,000 (Ex. 39 at ET-003599) |
| **Edelman Trust Acct 2005 Total:** | **$0** | **$5,000**[15] |
| | | |
| **GRAND TOTALS FOR BOTH ACCTS:** | **$572,246.54** | **$381,000** |

[15] There were several additional transfers to Mr. Edelman near the end of 2005 and throughout 2006 from the Edelman Trust account. However, as of October 2005, it appears most of the funding for the Edelman Trust began coming from the estate of Mr. Edelman's mother (the Estate of Mildred Ash) rather than from the Delos Trust. (*See* Ex. 39 at ET-003600.)  Indeed, the last transfer from the Delos Trust to the Edelman Trust occurred in April 2005, and that was for one of the interest-only payments on the Taos property. (*See* Ex. 39 at ET-003599.)  The Court finds it inappropriate to include funds originating from the Estate of Mildred Ash in the analysis of the Delos Trust.

Over $380,000 was funneled from the Delos Trust to Mr. Edelman through Dennis Stein's law firm, and this amount does not include any sums that were paid to third parties for Mr. Edelman's direct benefit.[16]

The complete domination of the Delos Trust by Mr. Edelman is clear. The Delos Trust existed solely to serve Mr. Edelman's purposes and acted as nothing more than a conduit for his personal finances. The instrumentality requirement to prove alter ego is easily satisfied here.

The Court turns next to the second requirement of the alter ego theory—whether Mr. Edelman's control over the Delos Trust was used for fraud or other improper purposes. *See Scott v. AZL Res., Inc.*, 107 N.M. 118, 122, 753 P.2d 897, 901 (N.M. 1988). The Court has little difficulty finding this to be the case. Mr. Edelman self-settled the Delos Trust after emptying a New York trust (of which he was not a beneficiary) while his criminal case was pending, and he has used the Delos Trust to launder a substantial amount of money to himself while keeping that money away from the IRS. Indeed, Mr. Edelman testified at trial that the Delos Trust initially held approximately $5.0 million, but the evidence shows that it now holds little to nothing. (*See* Ex. 82, 43.)

---

[16] For example, Peter Lazare testified at trial he had a Chase Visa credit card he allowed Mr. Edelman to use in the early 2000s because Mr. Edelman could not obtain his own credit card after his release from prison. Lazare would forward the each month's credit card statement to Dennis Stein's law firm, who would pay the credit card bill from one of the two accounts. (*Compare, e.g.,* Ex. 175, *with* Ex. 173 at ET-000607 (showing Chase Visa bill in the amount of $11,086.63 forwarded to Stein's law firm and a corresponding payment from Special E Account).)

The Court finds Mr. Edelman created the Delos Trust in anticipation of his escape from federal prison; its funds supported him and his family while he remained a fugitive in the South Pacific.  Since his return to the United States, Mr. Edelman has continued to use the Delos Trust as his personal piggybank.  The Delos Trust's settlement in Liechtenstein made it difficult for the government to seize any of it to apply to Mr. Edelman's enormous tax obligation, and Mr. Edelman, for his part, was careful to never transfer any money directly from the Delos Trust to himself so as to not draw attention to his assets.  The Delos Trust's sole reason for existing was to empty its coffers at Mr. Edelman's whim without exposing its assets to possible IRS collection.  This seems like nothing more than white collar money laundering.  The Court finds that Mr. Edelman used the Delos Trust to covertly pass his money to himself (through the Edelman Trust) so that it would not be seized by the IRS, a certainly-improper purpose.

The final prong of the alter ego test, proximate causation, requires a showing of "some knowing or cooperative effort between the related parties which results in unjust injury to the plaintiff."  *Garcia v. Coffman*, 124 N.M. 12, 17, 946 P.2d 216, 221 (N.M. Ct. App. 1997) (quoting Cathy S. Krendl & James R. Krendl, *Piercing the Corporate Veil: Focusing the Inquiry*, 55 Denver L.J. 1 (1978)).  This requirement is satisfied easily in the instant case.  There was a clear knowing or cooperative effort between Mr. Edelman and the Delos Trust which resulted in unjust injury to the USA.  Specifically,

the control exercised by Mr. Edelman over the Delos Trust allowed Mr. Edelman to

access and use his personal funds while preventing the USA from seizing those funds for

his substantial federal tax obligation.

Applying New Mexico law, the Court finds that the veil insulating the Delos Trust

should be pierced, and the Delos Trust from its settlement should be considered Mr.

Edelman's alter ego.  Therefore, under state law, Mr. Edelman holds legal interest and

rights to the Delos Trust.  With that finding, the Court now turns to the second part of the

two-part federal tax lien inquiry.

### C.    Step 2:  Whether Mr. Edelman's State Property Right in the Delos Trust is "Property" or "Rights to Property" that Falls Within the Reach of the § 6321 Federal Tax Lien

The Court now must ask, under federal law, whether Mr. Edelman's state-

delineated right in the Delos Trust qualifies as "property" or "rights to property" within

the federal tax lien statute.  *Krause*, 637 F.3d at 1163.  It is the federal revenue statutes

that designate which interests or rights, so created by state law, shall be taxed.  *Drye v.

United States*, 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999).

"The answer to this question is easy and affirmative.  Section 6321's language 'is

broad and reveals on its face that Congress meant to reach every interest in property that

a taxpayer might have.'"  *Krause*, 637 F.3d at 1166 (quoting *Drye*, 528 U.S. at 56)

(internal citations omitted).  "When Congress so broadly uses the term 'property,' we

recognize … that the Legislature aims to reach every species of right or interest protected by law and having an exchangeable value." *Drye*, 528 U.S. at 56 (internal quotation omitted).  From this broad, inclusive interpretation, the Court concludes that the terms "property" and "rights to property" under 26 U.S.C. § 6321 embrace not only rights or interest with exchangeable value that the taxpayer holds formal legal title to, but also those that are found (as here) to be the alter ego of the taxpayer.  *G.M. Leasing Corp.,* 429 U.S. at 351, 97 S.Ct. at 627-28 ("If [the entity] was Norman's alter ego, it had no countervailing effect for purposes of his federal income tax.  It would then follow that the Service could properly regard [the entity's] assets as Norman's property subject to the lien under § 6321."); *United States v. Gosnell*, 961 F.2d 1518, 1519 (10th Cir. 1992) ("Property held in the name of an entity which is the alter ego of a taxpayer may be levied on to satisfy the tax liabilities of the taxpayer.").

### D.      Conclusion to Alter Ego and § 6321 Analysis

Under New Mexico law, the Delos Trust is Mr. Edelman's alter ego and the trust veil should be disregarded.  The rights and interests in the Delos Trust that Mr. Edelman enjoyed under state law constituted "property" or "rights to property" under 26 U.S.C. § 6321.  *See Krause*, 637 F.3d at 1167.  Therefore, the assets of the Delos Trust are subject to the USA's federal tax judgments and liens.  That is, the assets in the Delos Trust should have been surrendered to the USA.  Of course, that did not happen.  Instead, Mr.

Edelman transferred money from the Delos Trust to the Edelman Trust.  Once it was

safely inside the United States and under the protective cloak of the Edelman Trust, much

of it was either transferred directly to Mr. Edelman or used for his direct benefit.  The

money that should have been applied toward Mr. Edelman's tax obligation was instead

secreted to Mr. Edelman's possession and advantage.  Specifically, a total of

$1,601,000.00[17] in discrete, identifiable funds was transferred from Mr. Edelman's alter

ego (the Delos Trust) to the Edelman Trust and then passed on in the transactions

described above.  The Court considers the appropriate remedy next.

## II.  Appropriate Remedy to Correct Mr. Edelman's Unlawful Use of the Delos Trust as his Alter Ego

The $1,601,000 that was funneled from the Delos Trust through the Edelman Trust

should have gone to the government to partially satisfy Mr. Edelman's enormous tax

debt.  The USA seeks to collect the money its due on the federal tax judgments and §

6321 tax liens.

### A.  The USA is Entitled to Seize and Collect on Any Assets Held by the Delos Trust

Under § 6321, the federal tax judgments against Mr. Edelman constitute a lien in

the USA's favor "upon all property belonging to" Mr. Edelman.  *G.M. Leasing Corp. v.*

---

[17] $  900,000  Down payment on Taos property
    $  320,000  8 interest-only payments on Taos property
+  $  381,000  Payments wire-transferred directly to Mr. Edelman
    $1,601,000

*United States*, 429 U.S. 338, 350-51, 97 S. Ct. 619, 627, 50 L. Ed. 2d 530 (1977).  As Mr.

Edelman's alter ego, the Delos Trust is Mr. Edelman's "property" under 26 U.S.C. §

6321.  Accordingly, the USA may seize and foreclose on any and all assets in the Delos

Trust to satisfy Mr. Edelman's federal tax obligation.

**B.      The USA is Entitled to a Constructive Trust Against the Edelman Trust**

In its rebuttal argument at trial, the USA requested the Court impose a constructive

trust against the money previously kept from it.

"A constructive trust is a legal fiction, 'an equitable remedy devised to prevent

unjust enrichment and compel restitution of property that in equity and good conscience

does not belong to the Defendant.'"  *United States v. Andrews*, 530 F.3d 1232, 1237 (10th

Cir. 2008) (quoting *Amdura Nat'l Distrib. Co. v. Amdura Corp., Inc. (In re Amdura

Corp.)*, 75 F.3d 1447, 1451-52 (10th Cir. 1996)).  A constructive trust "is a proper

remedy when a recipient acquired property by defrauding the claimant."  *Id.*

> The recipient of the property, the constructive trustee, is deemed to hold
> legal title to the property for the benefit of the claimant, and it is the
> obligation of the constructive trustee to surrender the property to the
> claimant.  *See* Restatement (Third) of Restitution and Unjust Enrichment, §
> 55(1)-(2) (Tentative Draft No. 6, 2008).

*Id.*  "The party seeking imposition of a constructive trust bears the burden of establishing

the trust requirements.  We look to state law to determine whether a party has met this

burden."  *In re Foster*, 275 F.3d 924, 926 (10th Cir. 2001) (internal citations omitted).

Under New Mexico law, a constructive trust may be

"imposed to prevent the unjust enrichment that would result if the person having the property were permitted to retain it."  *Aragon v. Rio Costilla Coop. Livestock Ass'n*, 112 N.M. 152, 156, 812 P.2d 1300, 1304 (1991). Circumstances such as "fraud, constructive fraud, duress, undue influence, breach of a fiduciary duty, or similar wrongful conduct" may give rise to such a trust.  *Id.*  If a court imposes a constructive trust, the person holding legal title is subjected to an equitable duty to convey the property to a person to whom the court has determined that duty is owed.  *Id.*

*In re Estate of Duran*, 133 N.M. 553, 565, 66 P.3d 326, 338 (N.M. 2003).

As part of the alter ego analysis, the USA already has established wrongful conduct by Mr. Edelman with regard to the Delos Trust.  Mr. Edelman self-settled the Delos Trust in Liechtenstein and used it as his personal bank account, funneling money from it through the Edelman Trust, all in order to hinder the USA's attempts to collect against Mr. Edelman's enormous federal tax liability.  Mr. Edelman has unjustly enriched himself; in equity and good conscience, the $1,601,000 set forth above does not belong to him.  Consequently, Mr. Edelman's conduct gives rise to a constructive trust in the USA's favor against the funds that were funneled from the self-settled Delos Trust for Mr. Edelman's personal benefit.

The difficulty with enforcing a standard constructive trust arises in this case, of course, because the funneled funds at issue have long since been expended.  However, the recipient of those funds—the Edelman Trust—continues to exist.  And it is the Edelman Trust that must be subjected to an equitable duty to convey the property to the

USA.  *See Estate of Duran*, 133 N.M. at 565, 66 P.3d at 338.  This is so because the Edelman Trust never should have received these funds in the first place; Mr. Edelman should have surrendered these funds to the USA pursuant to the federal tax judgments and tax liens.  The Edelman Trust was a willing conduit for Mr. Edelman's deception.[18] As the constructive trustee, the Edelman Trust is deemed to hold legal title to the funneled amounts for the USA's benefit.

The Court recognizes there were many other payments from the Edelman Trust made for the direct benefit of Mr. Edelman using funds that likely originated from the Delos Trust.  (*See, e.g.*, Ex. 175-181 (showing requests and payments for Lazare's Chase Visa credit card that Mr. Edelman used).)  The Court has attempted to balance this consideration against the fact that Mr. Edelman's three adult children are also named beneficiaries of the Edelman Trust.  Certainly, some of the Edelman Trust money benefitted them.[19]  The Court will not attempt to parse each possible ledger entry from

---

[18] The Edelman Trust served as the funnel to allow Mr. Edelman access to his other finances, as well.  For example, the evidence demonstrates that Mr. Edelman emptied the assets of one of his companies, Computational Market Dynamics, into the Edelman Trust and then received those distributions from the trust.  (*See, e.g.,* Ex. 187 at ET-000788 (showing a wire transfer from "Computational Market" in March 2003 for $10,000 and a wire transfer to Mr. Edelman for $10,000 the very next day); *id.* (showing another wire transfer from "Computational Market" in March 2003 for $3,500); *id.* at ET-000790 (showing a wire transfer from "Computational" in August 2003 for $8,000); Ex. 39 at ET-003599 (showing a wire transfer from "Computation" for $5,000 in April 2005 and a wire transfer to Mr. Edelman for $5,000 a few days later).)  Additionally, Mr. Edelman owned and sold publicly-traded stock and routed the proceeds through the Edelman Trust.  (*See* Ex. 187 at ET-000791 (showing "proceeds from Amazon sale" of $22,988 deposited into the Edelman Trust account in October 2003; Mr. Edelman confirmed at trial that this was a sale of stock of the online company).  Clearly, Mr. Edelman used the Edelman Trust as a conduit to pass his personal funds to himself while avoiding the reach of the USA's federal tax judgments and tax liens.

[19] The evidence is clear, though, that Mr. Edelman received the lion's share of the funds distributed by the Edelman Trust.  (*See, e.g.*, Ex. 73 (showing Mr. Edelman to have personally received nearly half of all Edelman Trust distributions in 2010).)

the various bank accounts, but instead will limit the constructive trust to the $1,601,000.00 in discrete, identified funds funneled from the Delos Trust to the Edelman Trust and then wrongfully passed on in the transactions described above.

The Court imposes a constructive trust over the Edelman Trust in the sum of $1,601,000.00—the amount received from the Delos Trust (Mr. Edelman's alter ego) and paid directly to or on behalf of Mr. Edelman in his attempts to avoid satisfying his federal tax obligation.  To satisfy this constructive trust, the USA may seize and foreclose on any assets currently in the Edelman Trust and any assets that enter the Edelman Trust in the future, up to the $1,601,000 constructive trust amount.

### C.     The USA is Entitled to Seize and Collect on the Taos Property, Subject to Any Superior Encumbrances

This Court's prior rulings and the parties' positions at trial suggests there is no real contest regarding the Taos property.  This Court previously ruled Acheff's mortgage on the Taos property is senior to the USA's tax liens, a position the USA has not disputed. (ECF No. 77, 97, 108 n.2.)  Further, the Edelman Trust disclaimed any interest in the Taos property and does not contest foreclosure.  (ECF No. 125.)  Additionally, Mr. Edelman previously disclaimed any interest in the Taos property.  (ECF No. 18.)  Finally, in closing argument at trial, Peter Lazare as trustee of the Edelman Trust stipulated that the USA has the right to collect any foreclosure sale proceeds remaining after Acheff collects his due.  The parties have essentially stipulated Acheff should be permitted to

foreclose his mortgage on the Taos property and force judicial sale, with the proceeds going first to Acheff and then, if any remain, to the United States in partial satisfaction of its tax judgments against Mr. Edelman.  The USA holds an enforceable tax lien and has the right to redeem the Taos property within 120 days from the date of public sale should it determine that the public sale yielded an inadequate sale price.[20]

### D.     The USA is Entitled to Seize and Collect on the *Elusive*

Mr. Edelman testified at trial that the *Elusive* currently is dry-docked in Connecticut.  The USA spent a great deal of its effort at trial making a case as to the yacht.  In closing argument, Peter Lazare as trustee of the Edelman Trust stipulated the USA could execute on any interest the Edelman Trust may hold in the *Elusive* to partially satisfy Mr. Edelman's tax obligation.

The real issue concerning the yacht is captured by Mr. Edelman's trial testimony: "Nobody seems to own *Elusive* [right now]."  Thus, the first question is whether Mr. Edelman, as the obligated taxpayer, holds any legal interest or right in the *Elusive* upon which the USA can collect.

Mr. Edelman testified the Cayman Islands corporation that holds/held title to the yacht (Astrolabe Marine Enterprises Ltd.) is essentially defunct.  Astrolabe Marine's corporate directors came from the Harbour Trust Co. Ltd., a Cayman Islands company

---

[20] The concessions of Mr. Edelman and Peter Lazare as trustee of the Edelman Trust render moot this Court's prior concerns regarding the enforceability of the USA's tax lien against the Taos property and its right of redemption following any foreclosure sale.  (*See* ECF No. 97.)

providing fund fiduciary services.  (*See* Ex. 65, 69, 71.)  That company, however, appears to have terminated its services to Astrolabe Marine due to lack of payment from the Edelman Trust.[21]  (*See* Ex. 69.)  Nothing suggests, however, the Delos Trust in Liechtenstein does not continue to hold the sole share of Astrolabe Marine (from Mr. Edelman's divorce), irrespective of whether Astrolabe Marine is defunct.[22]

Pursuant to the finding that the assets of the Delos Trust is subject to seizure under the USA's federal tax lien as Mr. Edelman's alter ego, the share of Astrolabe Marine likewise is subject to seizure as an asset of the Delos Trust.  In turn, the *Elusive*, as an asset of Astrolabe Marine, is also subject to seizure under the USA's federal tax lien to satisfy Mr. Edelman's federal tax obligation.

The second question with regard to the *Elusive* concerns priority of the competing liens.  The USA filed tax liens against Astrolabe Marine (listing the *Elusive* as the company's asset) in New Mexico in 2012.  (Ex. 77, 78.)  The Edelman Trust filed a vessel lien against the *Elusive* in Connecticut in 2009.  (Ex. 86.[23])  However, perhaps seeing the writing on the wall, the Edelman Trust stipulated in closing argument at trial that the USA could seize any interest the trust might hold in the *Elusive* in partial

---

[21] The fact that the Edelman Trust was paying the directors for Astrolabe Marine while Astrolabe Marine is owned by the Delos Trust is yet another example of the Edelman Trust acting as a passive conduit for the assets of the Delos Trust.

[22] Mr. Edelman also testified at trial that the original "title" to the *Elusive* was given to him but has since been lost in his many moves.

[23] The Edelman Trust's vessel lien is based on the extraordinary amount of money the Edelman Trust has paid over the years to care for the *Elusive*.  (*See* Ex. 86A (establishing that the Edelman Trust paid almost $130,000 toward the care of the Elusive during the years of 2007 and 2008).)

satisfaction of Mr. Edelman's federal tax liability.  This stipulation results in the USA

having the exclusive right of seizure and foreclosure against the *Elusive*.[24]

In sum, the *Elusive* constitutes Mr. Edelman's "property" under 26 U.S.C. § 6321.

The USA may seize the *Elusive* and force its judicial sale in partial satisfaction of Mr.

Edelman's federal tax debt.  Further, the USA's right to enforce its federal tax judgments

against the yacht exists whether the *Elusive* is owned by the Delos Trust (as Mr.

Edelman's alter ego), the Edelman Trust (under the constructive trust), or some

combination of the two.  The trustee of the Edelman Trust, to any extent necessary, is

required to fully cooperate with the USA's attempt to seize and sell the *Elusive* to

partially satisfy Mr. Edelman's federal tax burden.

## III.   The USA is Entitled to a Permanent Injunction Against the Edelman Trust for the Amount of the Constructive Trust

On November 27, 2013, this Court granted the USA's request for a preliminary

injunction.  (ECF No. 157.)  The Court ordered the Edelman trust to deposit all of its

income into the Court's registry, including any future income.  (ECF No. 157 at p. 8.)

Additionally, the Court enjoined Lazare, as trustee of the Edelman Trust, from

"liquidating, distributing, or encumbering any of the principal of the Edelman Trust

without the express and written order" of the Court.  (*Id.*)  In closing at trial, the USA

requested the preliminary injunction be continued into a permanent injunction.

---

[24] The USA's right to collect against whatever interest the Edelman Trust may have in the *Elusive* is also consistent with the constructive trust imposed against the Edelman Trust, discussed above.

**A.       Applicable Permanent Injunction Law**

"For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).  This standard is very similar to the standard for a preliminary injunction, and the findings supporting the preliminary injunction may be considered in the permanent injunction analysis.  *Id.*

**B.       Permanent Injunction Analysis**

The USA has satisfied these elements.  First, there can be little argument that the USA succeeded on the merits of its claims.  The Court has held the Delos Trust is Mr. Edelman's alter ego and the USA is entitled to a constructive trust against the Edelman Trust (as the recipient of the Delos Trust assets) for the amount of $1,601,000.

Second, irreparable harm is likely unless the permanent injunction is issued.  Specifically, over the last two decades, Mr. Edelman has quite successfully avoided paying much of his federal tax debt, largely by laundering his personal funds through the Edelman Trust.  The Edelman Trust holds assets that can partially satisfy this tax debt.  However, depletion of this assets by the trustee of the Edelman Trust (and Mr. Edelman's long-time personal friend), Peter Lazare, would prevent the USA from any meaningful

recovery.  If the Edelman Trust were depleted absent permanent injunction, it would

prevent the USA from collecting on the tax debt, which constitutes irreparable harm.

Third, the balance of equities weighs in favor of preventing the threatened injury.

The competing equities here include the USA's interest in preserving its ability to collect

against Mr. Edelman's tax debt and the Edelman Trust's other beneficiaries' (Mr.

Edelman's three adult children) interest in receiving appropriate distributions.  The Court

recognizes that its preliminary injunction barred the other beneficiaries from receiving

distributions, and any permanent injunction would continue that bar.  However, as was

the case with the preliminary injunction, there was no evidence presented at trial to

suggest that Mr. Edelman's adult children, who are all college students, are solely

dependent on the trust funds.  In fact, testimony at the preliminary injunction hearing

demonstrated they largely rely on loans and scholarships while receiving far fewer trust

distributions than their father, Mr. Edelman.  (ECF No. 157 at pp. 7-8; ECF No. 114 at

pp. 4-5.)  Further, the testimony at the preliminary injunction hearing indicated Mr.

Edelman's children are adults with the ability to find their own means of support.  (ECF

No. 114 at 5.)  No evidence was presented at trial to now question the Court's prior

findings, and the equities continue to weigh in the USA's favor.

Finally, a permanent injunction will not adversely affect the public interest.  An

injunction would preserve assets that are subject to Mr. Edelman's federal tax obligation,

an obligation that Mr. Edelman has not attempted to satisfy and, indeed, has actively avoided for many years.  Accordingly, a permanent injunction is in the public interest.

The preliminary injunction shall be continued into a permanent injunction.  The trustee of the Edelman Trust is enjoined from liquidating, distributing, or encumbering any assets of the Edelman Trust until the amount of the constructive trust ($1,601,000) is collected by the USA toward Mr. Edelman's federal tax obligation from the constructive trust imposed against the Edelman Trust.

## CONCLUSION AND ORDER

For the reasons discussed herein, the Court finds and concludes as follows:

1.      The Delos Trust from its inception is Mr. Edelman's alter ego under New Mexico law.  Consequently, the assets and funds held by the Delos Trust are subject to collection by the USA under its federal tax judgments and federal tax liens against Mr. Edelman.

2.      Money from the Delos Trust was laundered through the Edelman Trust and paid directly to Mr. Edelman or on his behalf.  This money was subject to collection by the USA, despite being transferred from the Delos Trust and funneled through the Edelman Trust.  These discrete, identifiable sums include $900,000 paid as the down payment for the Taos property; $320,000 in eight interest-only payments for the Taos property; and $381,000 in transfers directly to Mr. Edelman.  These sums have been

expended through the Edelman Trust, and the USA is entitled to a constructive trust against the Edelman Trust for the total amount of $1,601,000.

      3.      The USA is entitled to seize and collect against the *Elusive* as an asset of the Delos Trust.

      4.      Pursuant to the parties' stipulations, along with its federal tax judgments and liens, the USA is entitled to seize and collect against the Taos property, subject to any superior encumbrances including William Acheff's.  Any amount the USA collects on the Taos property shall be credited against the $1,601,000 constructive trust.

      5.      A permanent injunction is warranted to enjoin the trustee of the Edelman Trust from liquidating, distributing, or encumbering any assets of the Edelman Trust up to the amount of the constructive trust ($1,601,000).

**IT IS THEREFORE ORDERED** that the assets held by the Delos Trust, as Mr. Edelman's alter ego, are subject to collection by the USA under its federal tax judgments and federal tax liens against Mr. Edelman.

**IT IS FURTHER ORDERED** that the USA is entitled to seize and collect against the *Elusive* as an asset of the Delos Trust.  Mr. Edelman and the Edelman Trust shall cooperate with the USA's collection efforts to any extent necessary.

**IT IS FURTHER ORDERED** that the USA is entitled to a constructive trust against the Edelman Trust for the total amount of $1,601,000.

**IT IS FURTHER ORDERED** that the Edelman Trust is permanently enjoined from liquidating, distributing, or encumbering any assets of the Edelman Trust up to the amount of the constructive trust ($1,601,000).  This injunction shall expire once the USA has collected the amount of the constructive trust from the Edelman Trust.

**IT IS FINALLY ORDERED** that the USA is entitled to seize and collect against the Taos property subject to any superior encumbrances, including William Acheff's.

**ORDERED** this 29th day of January, 2014.

Scott W. Skavdahl
United States District Judge